### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

PEKIN INSURANCE CO. as subrogee   )
of DONALD and LYDIA LEVEQUE,   )
                                       )
       Plaintiff,           )
                                       )    No. 1:13-cv-02048
vs.                           )
                                     )    Hon. Judge Baker
MIDLAND RADIO CORPORATION,   )
                                     )    ORAL ARGUMENT REQUESTED
              Defendant.     )

### PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO THE DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE THE OPINION TESTIMONY OF PLAINTIFF'S EXPERTS

Plaintiff, PEKIN INSURANCE CO. as subrogee of DONALD and LYDIA LEVEQUE (hereinafter "Pekin"), by and through its undersigned counsel and pursuant to Rule 702 of the Federal Rules of Evidence, submits this Memorandum of Law in response to the *Daubert* Motion to Exclude the Opinion Testimony of Plaintiff's Experts filed by Defendant MIDLAND RADIO CORPORATION ("Midland").

## I.    FACTUAL ALLEGATIONS

This action arises out of a property damage subrogation matter filed by Pekin in connection with a fire in the residence belonging to its insureds, Donald and Lydia Leveque.  On November 24, 2011, approximately one week after the Leveques left town for vacation, a fire started in the dining room of their home.  *See* Plaintiffs' Complaint, p. 2.  Pekin subsequently retained the firm of Rimkus Consulting Group, Inc. to investigate the fire on its behalf.  A copy of David Mager's affidavit is attached hereto as Exhibit A and hereby incorporated by reference and made a part hereof.  *See* Ex. A., p.2.  David Mager ("Mager"), a certified fire investigator, performed an initial on-site fire investigation on November 30, 2011.  *Id.*, p.2.  During that

examination, he took 155 photographs, interviewed Pekin's insured and a member of the St. Anne Fire Department. *Id*. Based upon his interviews and observations, he determined that the fire originated in the dining room along the north wall under the window, and cordoned off the dining room of the residence with yellow "Do Not Disturb" tape. *Id*., pp.2-3. He then performed a second inspection on December 19, 2011, during which he took 143 photographs and collected artifacts. *Id*., p.3. He was also present for a joint laboratory evidence examination held on January 30, 2012 during which all the artifacts he collected from the scene were examined. *Id*. Although the methodology employed by Mager will be discussed in much greater detail below, based upon his inspections and observations Mager concluded that the fire originated in a WR-100 weather alert radio manufactured by Midland, which was energized and located on a desk in the dining room along the north wall at the time of the fire. *Id*., p.8.

Although Pekin notified Midland of its pending subrogation interest immediately after Mager's first visit to the scene, Midland never sought to have anyone inspect the residence on its behalf. *Spoliation Motion*, p.3. Between Mager's two inspections and after he had secured the dining room with yellow tape, Pekin retained ServPro, a cleaning company, to begin remediation on the residence. A copy of ServPro's December 22, 2011 letter to Pekin is attached hereto as Exhibit B and hereby incorporated and made a part hereof. Unbeknownst to Pekin, and despite the presence of the yellow tape, an employee of ServPro "knocked down" the yellow tape cordoning off the dining room, thus allowing the scene to be compromised. *See* Ex. B. Although ServPro's employees entered the dining room, no one can say what debris if any was disturbed, what items if any were removed or how the scene was compromised, if at all.

Pekin's other expert, John Diggle ("Diggle"), is a Senior Consultant for Rimkus a Certified Fire and Explosion Investigator and a registered professional engineer in 12 states,

including Illinois.  A copy of David Mager's affidavit is attached hereto as Exhibit C and hereby incorporated by reference and made a part hereof.  *See* Ex. C., p.2.  On January 30, 2012, Diggle performed a laboratory evidence examination during which he examined all the artifacts Mager had collected from the fire scene.  *See* Ex. C., pp.2-3.  Present during this examination were two experts retained by Midland.  *Id*.  Diggle subsequently conducted a laboratory artifact examination on February 9, 2012, during which time an exemplar weather alert radio was inspected and tested for flammability.  *Id*., p.3.   Like Mager, after following proper scientific methodology he too found the Midland weather alert radio to be the origin of the fire.  *Id*., pp.14-16.  Because the fire consumed all of the radio's housing and caused significant damage to the recovered circuit board, Diggle is of the belief that the fire originated within the circuit board but unable to ascertain the exact malfunction that caused the fire.  *Id*.  On February 15, 2012, Mager and Diggle issued a joint written report containing the afore-said conclusions, a copy of which is attached hereto as Exhibit D and hereby incorporated by reference and made a part hereof.  As with Mager, Diggle's methodology in reaching those conclusions will be discussed in much greater detail below.

After Midland denied liability for the fire, Pekin filed suit in federal court located in the Central District of Illinois.  Upon completion of written discovery, oral fact discovery and opinion witness discovery, Midland filed the instant *Daubert* Motion to Exclude Mager and Diggle's Expert Opinions.  For the reasons stated herein, said Motion should be denied.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 which governs the admissibility of expert testimony and provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or

to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert has reliably

applied the principles and methods to the facts of the case." *FRE* 702. In the seminal case of

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),

the Supreme Court established a two-step analysis for admitting expert scientific testimony under

Rule 702. First, a district court must determine whether an expert's testimony is reliable.

*Cummins v. Lyle Industries*, 93 F.3d 362, 367 (7th Cir. 1996) (citation omitted). "A district judge

should assure himself, before admitting expert testimony, that the expert knows whereof he

speaks," thus placing on the Court the obligation to ensure that "the proffered testimony pertains

to scientific knowledge." *Cummins*, 93 F.3d at 367-68 (citations omitted). "This task requires

the district court to consider whether the testimony has been subjected to the scientific method; it

must rule out 'subjective belief or unsupported speculation.'" *Id*. at 368 (citation omitted). After

performing the first step of the analysis, the district court has to determine "whether evidence or

testimony assists the trier of fact in understanding the evidence or in determining a fact in issue."

*Id*. (citation omitted).

"The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not

require that expert witnesses be academics or PhDs, or that their testimony be 'scientific'

(natural scientific or social scientific) in character. The principle of *Daubert* is merely that if an

expert witness is to offer an opinion based on science, it must be real science, not junk science."

*Tuf Racing Products, Inc. v. American Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir. 2000).

"A district court asked to admit scientific evidence must determine whether the evidence is

genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir. 1996).

"[A]n inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known.   In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability.  *Cummins*, , 93 F.3d at 368 (quoting *Daubert*, 509 U.S. at 589).  As the *Cummins* Court noted:

> As our cases applying *Daubert* have recognized, the Supreme Court has articulated several nonexclusive guideposts to assist the district courts in determining whether expert testimony fairly can be characterized as a scientific opinion: (1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence.  The inquiry is a flexible one; the focus must be solely on principles and methodology, not on the conclusions they generate.

*Cummins*, 93 F.3d at 368 (citations omitted).  As noted, the test of the reliability of the proffered opinions is a "flexible" one, and the four factors set forth in *Daubert* do not constitute a "definitive checklist or test."  *Shawgo v. General Motors Corp.*, 2007 WL 2301315 at *3 (S.D.Ill. 2007) (citations omitted).  "Whether the *Daubert* factors are pertinent to assessing reliability in a particular case depends on 'the nature of the issue, the expert's particular expertise, and the subject of his testimony," and a trial court should consider the specific factors identified in *Daubert* where they are "reasonable measures of the reliability of expert testimony." *Shawgo*, 2007 WL 2301315 at *3 (citations omitted).  "In short, the gatekeeping inquiry must be 'tied to the facts' of a particular case,' and 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'  *Id.* (citations omitted).  "No single factor is necessarily dispositive of the reliability of

a particular expert's testimony" and a "review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *Hoover v. Delaney*, 2003 WL 22038639 at *1 (N.D.Ill. 2003) (citing Advisory Committee Comments to the 2000 Amendments to Rule 702).

"Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 283 (8th Cir. 1995), *cert. denied).* "The rule clearly "is one of admissibility rather than exclusion." *Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir. 1991)*, cert. denied.* "A trial court should exclude an expert opinion only if it is so fundamentally unsupported that it cannot help the factfinder." *Hurst v. United States,* 882 F.2d 306, 311 (8th Cir. 1989). *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,* 80 F.3d 1074*,* 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

## III.   ARGUMENT

### A.   Both of Pekin's Experts Employed Proper Scientific Methodology

In its Motion, Midland does not take issue with the credentials of Pekin's experts, David Mager and John Diggle, but rather the methodology they employed in reaching their conclusions. Specifically, Midland (repeatedly) argues neither Mager nor Diggle employed appropriate scientific method in concluding that Midland's weather radio was the cause of the subject fire. As such, it is first necessary to examine the methodology employed by Pekin's experts.

1.      **Pekin's expert David Mager followed proper scientific method in determining the origin of the fire.**

Pekin's expert David A. Mager is a Fire Investigator for Rimkus Consulting Group, Inc., as well as a Certified Fire Investigator with the Illinois State Fire Marshall's Office and the International Association of Arson Investigators.  A copy of David Mager's *curriculum vitae* is attached hereto as Exhibit E and hereby incorporated by reference and made a part hereof.  *See* Ex. E.  He is also a Certified Fire Officer II with the Illinois State Fire Marshall's Office and has investigated more than 150 fires.  *Id*.  He also conducts live fire training exercises for firefighters through the Illinois State Fire Marshall Office, including the use of authentic room furnishings and classes on fire behavior and evidence preservation.  *Id*.  He is also a Deputy Chief and Training Officer with the Midlothian, Illinois Fire Department.  *Id*.

Mr. Mager's company received the assignment to investigate the underlying fire from Pekin on November 28, 2011, approximately four days after the fire occurred, and he performed an initial on-site fire investigation on November 30, 2011.  *See* Ex. A, p.2.  During that examination, he took 155 photographs, interviewed Pekin's insured and a member of the St. Anne Fire Department, and cordoned off the dining room of the residence with yellow "Do Not Disturb" tape.  *Id*., pp.2-3.  He then returned for another inspection on December 19, 2011, during which he took 143 photographs and collected artifacts.  *Id*., p.3.  He was also present for the January 30, 2012 joint laboratory evidence examination during which all the artifacts he collected from the scene were examined.  *Id*.

Despite the arguments put forth by Midland in its Motion, Mager clearly complied with NFPA 921 and the appropriate scientific methodology in reaching his conclusion that the Midland weather radio was the source of the subject fire.  He analyzed burn patterns, potential ignition sources, took statements from witnesses and applied fire dynamics in determining the

area of origin of the fire, all of which are consistent with NFPA 921, Chapter 17.1.2 on Origin Determination.  *Id*.  During his interview, the member of the St. Anne Fire Department confirmed that the fire occurred in the dining room along the north wall at the window, and the fire fighter confirmed that they found flames in the dining room and specifically at that window when they arrived on the scene.  *Id*., p.4.

Mager analyzed the burn patterns, finding them to be consistent with the fire originating along the north wall of the dining room.  *Id*.  This is consistent with NFPA 921, Chapter 6.3.1 on Fire Patterns which states: "Fire patterns are often found on walls and ceilings. As the hot gas zone and the flame zone of the fire plume encounter these obstructions, patterns are produced that investigators may use to trace a fire's origin."  *Id. (*citing NFPA 921, *Fire and Explosion Investigations* (2011 Ed.)).  He noted that the movement of the fire and heat from the center of the north wall of the dining room up and outward into the kitchen and other areas of the structure were consistent with general principals of fire behavior.  *See* Ex. A, p.4.  Contrary to Midland's assertions, Mager considered other areas of origin for the fire and eliminated them due to a lack of fire damage or lack of potential ignition sources.  *Id.*, pp.44-5.  He examined the entire house and observed no direct fire damage to any other rooms, thereby eliminating them as possible rooms of origin and in turn eliminating any potential ignition sources within those rooms.  *Id*.

Mager methodically eliminated other appliances and potential ignition sources located within or in proximity to the dining room.  He eliminated the television as an ignition source due to its lack of fire damage, the fact it was not consumed by fire and its location in the kitchen, which did not evidence direct fire damage.  *Id*., p.5.  He also found that the burn patterns were not consistent with the fire originating at the television and communicating to the dining room, facts which were all confirmed by the photographs he took at the scene during his initial

inspection.  *Id*.  Mager eliminated the ceiling fan/lamp as a potential ignition source due to its lack of fire damage; its location with respect to the damage in the living room and the lack of a first fuel present in close proximity to the fan.  *Id*.  His investigation revealed the lack of any burn patterns above or below the fan/lamp to support the notion that a fire had originated there, another fact confirmed by the photographs he took on November 20, 2011.  *Id*.  Mager considered and eliminated the computer equipment and power strip as potential ignition sources because they were not plugged in at the time of the fire, additional facts confirmed by photographs he took during his initial inspection on November 30, 2011.  *Id*., pp.5-6.

He was able to eliminate the branch circuit wiring within the dining room wall due to the fact the wiring had sustained minimal direct fire damage and the insulation on said wiring was partially charred but not consumed by the fire.  *Id*., p.6.  Mager further examined the burn patterns within the dining room wall, noting that if the fire had originated at the branch wiring the fire damage would have been severe inside the wall cavity before the fire breached the wall covering and extended into the room.  *Id*.  Since he found very little damage inside the wall cavity, he was able to eliminate the branch wiring as an ignition source.  *Id*.  Mager was able to eliminate arson as a cause of the fire because Pekin's insureds had been in Florida for a week when the fire occurred; the residence was secure when the fire department arrived and they had to force entry through the front door; and personal and high value items such as guns, a bow and arrows, big screen televisions and other electrical components were still in the home during his initial inspection.  *Id*., p.7.  A check of weather and climate reports confirmed there were no storms or lightning in the area at the time of the fire, and thus Mager was able to eliminate a natural causes for the subject fire.  *Id*.  The fact that Pekin's insureds had left the home seven

days prior enabled him to eliminate candles and the careless use of smoking materials as causes of the fire.  *Id.*

In conformity with accepted methodology, Mager collected all the artifacts that he could not eliminate through cognitive testing so that they could be examined by an electrical engineer in his office.  *Id.*, p.8.[1]  In conformity with NFPA 921, Mager considered all realistic potential ignition sources and each potential hypothesis was tested via fundamental principles of science, scientific literature, physical experiments, or cognitive experiments.  *Id.*  Applying this methodology, the only potential ignition source that could not be ruled out was the Midland weather alert radio because it was plugged in, energized and located within the area of origin at the time of the fire.  *Id.*  Although the fire damage to the radio was too extensive for an exact causal failure to be determined, in Mager's opinion the sum of the evidence collected from the fire scene shows that the fire was most probably the result of an electrical failure on the circuit board of the Midland weather alert radio.  *Id.*

**2.      Pekin's expert John Diggle followed proper scientific method in determining the cause of the fire.**

Pekin's other expert, John Diggle, is a Senior Consultant for Rimkus Consulting Group, Inc.  A copy of John Diggle's *curriculum vitae* is attached hereto as Exhibit F and hereby incorporated by reference and made a part hereof.  *See* Ex. F.  He is a Certified Fire and Explosion Investigator and is a registered professional engineer in 12 states, including Illinois, and is a Member of the National Fire Protection Association.  *Id.*  He has been employed with Rimkus since 2010 and regularly provides expert witness and consulting services regarding

---

[1] Mager also notes that Midland was notified of both his initial inspection and his second inspection, which took place almost one month after the fire and during which he collected artifacts for further examination and testing. *See* Ex. A., p.8.  Had Midland wished to secure and examine any additional artifacts it certainly had the opportunity to do so; it knew that Pekin had to eventually set about remediating the fire damage and repairing its insureds' home. Midland certainly could not expect the fire scene to remain intact into perpetuity.

electrical failures, including forensic investigations of electrical systems and appliances to determine potential failure scenarios, residential, commercial and industrial building fire investigations, and consumer product failure analysis.  *See* Ex. F.

On January 30, 2012, Diggle performed a laboratory evidence examination during which he examined all the artifacts David Mager had collected from the fire scene.  *See* Ex. C., pp.2-3. Present during this examination were two experts retained by Midland.  *Id.*  Diggle subsequently conducted a laboratory artifact examination on February 9, 2012, during which time an exemplar weather alert radio was inspected and tested.  *Id.*, p.3.

Diggle relied on the cause and origin investigation and two scene inspections conducted by Mager to collect the evidence he examined.  *Id.*  One of the items collected by Mager was the remains of a circuit board discovered on the floor if the dining room amidst the burned remains of an antique wood desk, consistent with the room layout as testified to by Pekin's insureds.  *Id.*, pp.3-4.  The circuit board was subsequently identified to be the remains of a Midland weather alert radio, and Diggle found the damage sustained by the radio circuit board to be consistent with the radio being located on the antique wood desk at the time of the fire. *Id.*, p.3.  The power supply adapter for the radio was found plugged into a receptacle outlet on the north wall of the dining room, and Mager's visual inspection and burn pattern analysis of the receptacle outlets in the dining room revealed that the radio was the only electrical device that was plugged in within the room of origin at the time of the fire.  *Id.*, pp.3-4.

Diggle's laboratory examination of the weather alert radio's circuit board revealed that the radio had sustained significant fire damage; specifically, the entire plastic housing for the radio was consumed by the fire.  *Id.*, p.4.  Although the electrical components that populated the circuit board had become desoldered and were no longer attached to the circuit board, the circuit

board itself exhibited uniform and severe fire damage along the entire board. *Id*. Comparing the
circuit board to the other artifacts recovered from the scene, Diggle noted that no other electrical
device exhibited as much fire damage as the radio and no other potential ignition sources were
found among said artifacts. *Id*. In Diggle's opinion, the damage to the weather radio's circuit
board was too extensive for him to identify the specific electrical failure that may have occurred
on the circuit board; but the affirmative physical evidence indicated that the radio was positioned
within the center of the area of origin at the time of the fire, sustained severe and localized fire
damage to its main body, and was the only energized appliance in the dining room at the time of
the fire. *Id*., pp.4-5.

Contrary to the erroneous statements of Midland, Diggle's elimination of all other causes
was a part of his final conclusion but not the sole basis for those conclusions. *Id*., p.5. Diggle
carefully considered all realistic potential ignition sources and systematic eliminated them in
conformity with the scientific method as detailed in NFPA 921. *Id*., p.5. Specifically, NFPA
921, Chapter 19.5 on Fire Cause Determination, provides:

> 19.5 Developing a Cause Hypothesis. The investigator should use the scientific
> method *(see the Basic Methodology chapter)* as the method for data gathering,
> hypothesis development, and hypothesis testing regarding the consideration of
> potential ignition sequences. This process of consideration actually involves the
> development and testing of alternate hypotheses. In this case, a separate
> hypothesis is developed considering each individual competent ignition source at
> the origin as a potential ignition source. *Systematic evaluation (hypothesis
> testing) is then conducted with the elimination of those hypotheses that are not
> supportable (or refuted) by the facts discovered through further examination. The
> investigator is cautioned not to eliminate a potential ignition source merely
> because there is no obvious evidence for it. For example, the investigator should
> not eliminate the electric heater because there is no arcing in the wires or
> because the contacts are not stuck.* There may be other methods by which the
> heater could have been the ignition source other than a system failure, such as
> combustible materials being stored too close to it. Potential ignition sources
> should be eliminated from consideration only if there is reliable evidence that they
> could not be the ignition source for the fire. *For example, an electric heater can
> easily be eliminated from consideration if it was not energized."*

NFPA 921, *Fire and Explosion Investigations* (2014 Ed.) (emphasis added).

Diggle's methodology further comports with NFPA 921 as he considered all realistic potential ignition sources for the fire and eliminated any hypothesis that is not supportable by the facts of the investigation. *See* Ex. C, p.6. In its Motion, Midland cites NFPA 921, Chapter 18.6.5, which states: "The process of determining the ignition source for a fire, by eliminating *all* ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source of *which there is no evidence of its existence*, is referred to by some investigators as "negative corpus." NFPA 921, *Fire and Explosion Investigations* (2011 Ed.) (emphasis added). As is clearly shown, the scientific method employed by Diggle differs greatly from "negative corpus" in two key facets: not all known potential ignition sources were eliminated (i.e., the Midland weather alert radio), and the existence of the radio within the area of origin is clearly indicated by the physical evidence. *See* Ex. C, p.6.

Like Mager, Diggle considered all reasonable potential ignition sources for the cause of the fire that were found within the room of origin, including the Midland weather radio, a digital picture frame, a printer, a power strip, a television set, a VCR, a ceiling fan, the receptacle outlets and the branch circuit wiring. *See* Ex. C., p.7. He was able to eliminate all of these electrical items through personal inspection of the objects themselves or through personal examination of photographs taken at the scene. *See* Ex. C., p.10. He was summarily able to eliminate the printer and power strip because the physical evidence and testimony of Pekin's insureds was consistent with those items being neither plugged in nor energized at the time of the fire. *See* Ex. C., p.7. In addition, the photographs of the printer and power strip showed those items sustained minimal direct fire damage and were not located at the origin of this fire. *Id.*

based upon the testimony of Pekin's insureds, the television set and VCR were located outside the room of origin at the time of the fire , were not located within the area of origin during Mager's initial site inspection, and photographs of these items taken at the scene show these appliances sustained minimal direct fire damage and were not located within the area of origin. *Id*.  Diggle was likewise able to eliminate the ceiling fan as photographs indicated that it too had sustained minimal direct fire damage and was not located within the area of origin. *Id*., p.8. Photographs of the branch circuit wiring located in the dining room wall show that it had sustained minimal direct fire damage, and that the insulation on the branch circuit cable was partially charred but not consumed by the fire.  *Id*.

Diggle inspected the receptacle outlets from the north wall of the dining room and found that the plastic bodies for both were still intact and exhibited minimal direct fire damage.  *Id*. He found no evidence of any electrical arcing activity or other electrical failure on either receptacle, and the damage exhibited by both receptacles was not consistent with either device being located at the point of origin of the fire.  *Id*.  He was able to eliminate the digital picture frame which Pekin's insureds indicated was located in the dining room at the time of the fire, as Mager's investigation found that the frame could not have been plugged into an outlet at the time of the fire and a power cord does not have the potential to start a fire if it is not plugged into an outlet.  *Id*., pp.8-9.  Furthermore, since the plastic body of the digital picture frame was mostly intact and was not significantly damaged by direct fire attack, the damage indicates the digital picture frame was not located at the point of origin of this fire.  *Id*., p.9.

Following accepted scientific methodology, the Midland weather alert radio was the only known potential electrical ignition source that Diggle could not rule out.  *Id*.  Based upon the systematic elimination of all other reasonable potential ignition sources, the affirmative physical

evidence of the radio's location and fire damage, and cognitive testing of the ignition potential of an exemplar weather alert radio, Diggle concluded that the fire was most probably the result of an electrical failure on the main circuit board of the Midland weather alert radio. *Id.* Because of the nature of fire in general, Diggle was not able to determine the exact, specific electrical failure. *Id.*

Further following NFPA guidelines, Diggle performed a physical experiment to qualitatively test the flammability of the plastic housing for the Midland weather alert radio, although NFPA 921 does not require any such testing to be a physical experiment. *Id.*, p.12. NFPA 921, Chapter 18.6.4 details the possible means of hypothesis testing and states: "Hypothesis testing may include: any application of fundamental principles of science, physical experiments or testing, cognitive experiments, analytical techniques and tools, and systems analysis." NFPA 921, *Fire and Explosion Investigations* (2014 Ed.) (emphasis added). Applying these types of tests, Diggle was able to evaluate and eliminate all other electrical ignition sources other than the Midland weather alert radio that were found within the area of origin. See Ex. C, p.13. For example, he was able to rule out the printer based upon the fundamental principle of science that a printer that has not been plugged in for several weeks will not contain any electrical energy and therefore cannot be a potential ignition source. *Id.* Illustrating another example of the testing he applied, a cognitive experiment was performed on the digital picture frame: if the picture frame was located at the point of origin of this fire, then it would have exhibited significant fire damage. *Id.* Because it exhibited only very minor damage consistent with external thermal attack and most of the plastic enclosure was still intact, Diggle was able to rule it out as a potential ignition source. *Id.*

As he testified in his deposition, Diggle performed a physical experiment to evaluate whether the plastic enclosure that was in close proximity (less than one quarter inch) to the radio's circuit board was capable of ignition and sustained combustion. *Id*. A piece of plastic was removed from an exemplar Midland weather alert radio and was held up to a propane torch. *Id*. He observed that the plastic ignited quickly and sustained combustion long after the propane torch was removed, resulting in a flaming drip that fell and pooled on the floor. *Id*. Because the fire consumed much of the combustible material within the area of origin and therefore the precise chain of events for the fire cannot be determined, the plastic housing of the radio, which was tested and demonstrated to be a competent fuel source, was located in close proximity to the weather alert radio circuit board. *Id*., pp.14-15. Furthermore, multiple competent secondary fuel sources, including picture frames, mini blinds, and the wood desk were reported to have been located within the area of origin by Pekin's insureds. *Id*.

It is clear that the fire investigation performed by Diggle, in conjunction with that performed by Mager, was in accordance with NFPA guidelines. Other than the Midland weather alert radio all realistic potential ignition sources were considered and eliminated, and each potential hypothesis was tested via the fundamental principles of science, scientific literature, physical experiments, or cognitive experiments. The only potential ignition source that could not be ruled out was the Midland weather alert radio, which was plugged in, electrically energized, and located within the area of origin at the time of the fire. *See* Ex. D. Given the physical nature of a fire in general, the damage to the radio was too extensive to permit an exact causal failure to be determined. *Id*. However, applying scientific method Diggle determined that the sum of the evidence collected from the fire scene indicated that the fire was most probably the result of an electrical failure on the circuit board of the Midland weather alert radio. *Id*.

B.   **Although Both Mager and Diggle Followed NFPA 921, Numerous Courts Have Found That Reliance on a Methodology Other Than NFPA 921 Did Not Render an Expert's Opinion *Per Se* Unreliable.**

As Midland states in its Motion, NFPA 921, *Guide for Fire and Explosion Investigations*, was developed to improve the fire investigation process and the quality of information resulting from the investigative process.  *Daubert Motion*, p.3.  However, recent changes to the 2014 edition of NFPA 921 have clarified some of the vagueness upon which Midland relies in support of its Motion.  Furthermore, several courts, including the Northern District of Illinois, have held that an expert's failure to follow NFPA 921 to the letter did not render that expert's opinions *per se* unreliable.

1.   **Mager and Diggle complied with NFPA 921.**

NFPA 921, Chapter 17.1.2 on Origin Determination, states: "Determination of the origin of the fire involves the coordination of information derived from *one or more* of the following: Witness Information, Fire Patterns, Arc Mapping and Fire Dynamics."  NFPA 921, *Fire and Explosion Investigations* (2014 Ed.) (emphasis added).  As stated herein, Mager interviewed Pekin's insured and a member of the St. Anne Fire Department, studied burn patterns, and applied fire dynamics by considering and ruling out all competent ignition sources within the northern half of the dining room in reaching his conclusion that the fire originated along the north wall of the dining room under the window, and specifically in the Midland weather alert radio.  Midland's Motion cites NFPA 921, Chapter 18.6.5, which discusses the inappropriate use of the process of elimination called "negative corpus."  The 2011 edition of NFPA stated:  "The process of determining the ignition source for a fire, by eliminating all ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source for which there is no evidence of its existence, is

17

referred to by some investigators as "negative corpus."  Negative corpus has typically been used in classifying fires as incendiary..."  NFPA 921, *Fire and Explosion Investigations* (2011 Ed.)  In the instant matter, *negative corpus does not apply because both Mager and Diggle identified a competent ignition source which was recovered in the area of origin:  the Midland weather alert radio*.  As Mager states in his affidavit, when the notion of "negative corpus" was first introduced into NFPA 921 in the 2011 edition, it was done so primarily due to investigators classifying fires as incendiary or accidental when all known potential ignition sources were eliminated."  *See* Ex. B, p.7.  As discussed above, both Mager and Diggle used the elimination of *other* potential known ignition sources as part of their investigation process and testing, resulting in their finding of a competent ignition source recovered in the area of origin.  NFPA 921 instructs the investigator to consider all potential ignition sources for a given fire and to eliminate any hypothesis that is not supportable by the facts of the investigation, which was done by both Mager and Diggle.

In 2014 NFPA 921 was revised to provide as follows:

> 19.5 Developing a Cause Hypothesis. The investigator should use the scientific method *(see the Basic Methodology chapter)* as the method for data gathering, hypothesis development, and hypothesis testing regarding the consideration of potential ignition sequences.  This process of consideration actually involves the development and testing of alternate hypotheses.  In this case, a separate hypothesis is developed considering each individual competent ignition source at the origin as a potential ignition source.  *Systematic evaluation (hypothesis testing) is then conducted with the elimination of those hypotheses that are not supportable (or refuted) by the facts discovered through further examination.  The investigator is cautioned not to eliminate a potential ignition source merely because there is no obvious evidence for it.  For example, the investigator should not eliminate the electric heater because there is no arcing in the wires or because the contacts are not stuck.* There may be other methods by which the heater could have been the ignition source other than a system failure, such as combustible materials being stored too close to it.  Potential ignition sources should be eliminated from consideration only if there is reliable evidence that they

> could not be the ignition source for the fire.  *For example, an electric heater can easily be eliminated from consideration if it was not energized.*

NFPA 921, *Fire and Explosion Investigations* (2014 Ed.) (emphasis added).  Diggle followed this process of scientific methodology in eliminating all other causes as part of his final conclusions, but clearly they were not the entire basis for his conclusions, not the entire basis. He carefully considered all realistic potential ignition sources and systematically eliminated all of them except the Midland weather alert radio, a process which is clearly detailed in NFPA 921. Furthermore, neither the scientific method nor NFPA 921 requires that testing be in the form of physical experiments. The 2014 edition of NFPA 921, Chapter 18.6.4 details the possible means of hypothesis testing, which includes "any application of fundamental principles of science, physical experiments or testing, cognitive experiments, analytical techniques and tools, and systems analysis."  NFPA 921, *Fire and Explosion Investigations* (2011 Ed.).  As detailed herein, both Diggle and Mager tested their hypotheses in a number of ways and came up with the same conclusion:  the Midland weather alert radio was the ignition source of the fire that damaged Pekin's insureds' home.  *See* Ex. D.

> **2.      The Northern District of Illinois has previously rejected the arguments being put forth by Midland as matters of credibility and not admissibility.**

This Court's decision in the case of *Abu-Hashish v. Scottsdale Ins. Co*., 88 F.Supp.2d 906 (N.D.Ill. 2000), involved issues very similar to the instant matter.  In *Abu-Hashish*, the plaintiffs owned a three-story building in Chicago which was insured by the defendant under a policy naming the plaintiffs as beneficiaries.  *Abu-Hashish*, 88 F. Supp2d at 907.  In the early morning hours of April 23, 1997, a fire occurred on the second and third floors of the building.  *Id*. Shortly after the fire began, a fire investigator with the Chicago Fire Department inspected the premises.  *Id*.  He did not remove any physical evidence or artifacts, nor did he observe any

flammable combustible accelerants.  *Id.*  Based on his analysis of the burn patterns, he determined there was only one fire which had spread from the second floor to the third floor, which he found to be "deliberately incendiary" and caused by one or more people using a hand held, open flame ignition source to ignite combustible materials positioned along the dining room wall of the second floor apartment.  *Id.*  A Bomb and Arson Detective with the Chicago Police Department also inspected the scene after the fire had been extinguished and after speaking with the fire investigator.  *Id.*  Upon completing her investigation, she opined that vagrants had been occupying the second floor apartment and that the cause of the fire was the ignition of available materials by an open flame.  *Id.*

Plaintiffs retained a certified fire investigator, who reviewed the reports prepared by the Chicago Police and Fire Departments, the deposition testimony of the fire investigator and detective, and NFPA 921.  *Id.* at 908.  Based on this review, plaintiff's expert concluded that the fire originated in the second floor apartment before spreading to the third floor, and that the cause of the fire was "undetermined" because of a lack of physical evidence preventing a determination, to a reasonable degree of fire certainty, that the fire was incendiary.  *Id.*  The defendant also hired its own certified fire inspector, who inspected the premises and observed empty fuel containers in the third floor front apartment.  *Id.*  Defendant's expert did not remove any physical evidence or artifacts, nor did he take any fire debris samples to be tested for the presence of an accelerant. *Id.*  Based solely on the burn patterns, he determined that separate incendiary fires originated on the second and third floors of the building.  *Id.*  After the defendant carrier denied the plaintiffs' claim, in part on the grounds that the fire resulted from an intentional act by or on behalf of the plaintiffs, suit was filed.  *Id.*  Prior to trial, the plaintiffs filed a Partial Motion for Summary Judgment and a Motion *in Limine* seeking to bar the

testimony of the defendant's expert and the CFD investigator on the grounds that the opinions of both did not follow recognized scientific methodology and were therefore barred under *Daubert* and Rule 702.  *Id*. at 907.

Like Midland, the plaintiffs in *Abu-Hashish* argued that the opinions of defendant's expert and the CFD investigator were not reliable because they were not grounded in the methods and procedures put forth in NFPA 921.  *Id*. at 908.  Like Midland in the instant matter, the plaintiffs argued that the opinions of defendant's expert were not based on the scientific method because the only physical evidence he observed at the fire scene was a series of burn patterns, and therefore had no physical evidence to support his conclusion that the fire was incendiary.  *Id*.  Defendant's expert even testified during his deposition that the burn patterns could also have supported a conclusion that the fire was careless and not intentional.  *Id*. Likewise, plaintiffs contended that the CFD investigator's opinions were not based on the scientific method because he too only considered the burn patterns, which he also testified could have been consistent with someone accidentally dropping a cigarette in the area of origin.  *Id*. Based on these arguments, the plaintiffs sought to bar both experts from testifying at trial.  *Id*

Similar to the actions of Mager and Diggle, the defendant in *Abu-Hashish* argued its expert inspected the building and fire scene to determine an area of origin and to eliminate potential causes for the fire, interviews the owners of the building and reviewed the CFD fire reports to determine what fire-fighting efforts the CFD had to employ.  *Id*. at 909.  Because he did not examine the scene until more than three weeks after the fire, defendant's expert argued that taking samples for testing would have been fruitless.  *Id*.  Like Mager in the instant matter, defendant's expert testified about the potential ignition sources he observed at the scene, the burn patterns he observed, and the fuel sources found in the areas of origin.  *Id*.  Similarly, the CFD

investigator testified about the interview he conducted with the fire incident commander, his inspection of the appliances and fixtures in the building, his observation of the scene and his elimination of all accidental causes of the fire.  *Id.*

In denying the *Motion in Limine*, the Court found that both experts "were able to provide adequate methodological explanations based on relevant evidence ( *e.g.,* burn patterns) as to how they reached their conclusions that the fire(s) was incendiary.  Fundamentally, and respectfully, the court finds that the points relied on by Plaintiffs are matters of witness credibility not admissibility."  *Id.* at 910.

### 3.     Other courts have similarly rejected the arguments being put forth by Midland.

In *Travelers Prop. & Casualty Corp. v. General Electric Co.,* an insurer brought a products liability subrogation action alleging that a design defect in the defendant's clothes dryer had caused 23 separate fires.  *Travelers Prop. & Casualty Corp. v. General Electric Co.,* 150 F.Supp.2d 360, 362 (D.Conn. 2001).  Following an evidentiary hearing and oral arguments on the defendant's motion to exclude the testimony of plaintiff's expert under *Daubert,* the District Court held that the expert's opinion satisfied *Daubert's* standard for admissibility.  *Travelers,* 150 F.Supp.2d at 362.  Specifically, the Court paid heed to *Daubert* by noting that "the test of reliability, however, is a 'flexible' one … [and the court's] gatekeeping inquiry must be 'tied to the facts' of a particular case."  *Id.* at 364 (citations omitted).  Even though the defendant had to depose plaintiff's expert 12 separate times and the Court found that the expert had "developed and articulated his opinion over time," the Court nevertheless allowed the expert to testify regarding his opinions.  *Id.* at 365.  Although he did an "exceptionally poor job articulating [his] methodology" and performed tests after he issued his report, the Court found that the defendant's concerns over the way the expert conducted his investigation were more appropriate for

"rigorous cross-examination."  *Id*. at 366.  As the Court stated, proponents "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable.... The evidentiary requirement of reliability is lower than the merits standard of correctness."  *Id*. at 367 (citation omitted).  *See also Depositors Ins. Co. v. Hall's Restaurant, Inc.*, 2014 WL 1259768 (E.D.Mo. 2014) (holding that even though plaintiff's expert failed to obtain control samples from the fire debris and used the process of elimination to reach his conclusion as to the ignition source of the fire, the expert was allowed to testify regarding his opinions); *GuideOne Mut. Ins. Co. v. Berghaus Organ Co.*, 2011 WL 1402869 at *5-6 (N.D.Ill. 2011) ("the court is not convinced in a case like this one where most of the evidence was destroyed by the fire that the lack of precise scientific testing automatically demonstrates the unreliability of the expert's opinion); *Winters v. Fru–Con Inc.,* 498 F.3d 734, 742 (7th Cir. 2007) ("There could be situations where the district court determines the proposed expert's testimony ... is reliable despite a lack of testing ... because the expert has adhered to the standards of intellectual rigor that are demanded in his or her professional work, such as … making proper personal observations or taking other appropriate actions"); *Cummins v. Lyle Indus.,* 93 F.3d 362, 369 (7th Cir.1996) ("hands-on testing is [not] an absolute prerequisite to the admission of expert testimony").

### C.    Midland's Criticisms of the Opinions of Pekin's Experts Amount to Nothing More Than Subjects For Cross-Examination.

It is axiomatic that Midland takes issue with the opinions of Pekin's experts, as they have opined that Midland's product caused the fire that damaged Pekin's insureds' home.  However, none of the criticisms of said opinions put forth by Midland amount to anything more than material to be used on cross-examination.  "[T]he trial court's role as gatekeeper is not intended

to serve as a replacement for the adversary system." *14.38 Acres of Land,* 80 F.3d at 1078.  As

the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

       Contrary to the arguments of Midland, there is ample affirmative evidence to prove that

the Midland weather alert radio was the origin of the subject fire.  Like the experts in *Abu-*

*Hashish*, Mager inspected the building and fire scene to determine an area of origin and to

eliminate potential causes for the fire, and he interviewed the homeowner and a member of the

local fire department.  Similarly, like the aforesaid expert, Mager opined about and testified to

the potential ignition sources he observed at the scene, the burn patterns he observed, and the

fuel sources found in the areas of origin.  And like the experts in *Abu-Hashish*, both Mager and

Daggle have testified about their inspection of the appliances and fixtures found at the scene,

their observations of the scene and their elimination of all other potential origins of the fire.  As

the Court stated in that case, both experts "were able to provide adequate methodological

explanations based on relevant evidence ( *e.g.,* burn patterns) as to how they reached their

conclusions…. Fundamentally, and respectfully, the court finds that the points relied on by

Plaintiffs are matters of witness credibility not admissibility." *Abu-Hashish*, 88 F.Supp.2d at

910.

       As the NFPA provides in relevant part, "Potential ignition sources should be eliminated

from consideration only if there is reliable evidence that they could not be the ignition source for

the fire. *For example, an electric heater can easily be eliminated from consideration if it was*

*not energized.*" NFPA 921, *Fire and Explosion Investigations* (2014 Ed.) (emphasis added).

Mager and Diggle have provided a detailed description of the scientific method they used to

arrive at their conclusions, and other than calling their opinions "guesswork" Midland has not provided any support whatsoever for the claimed inadequacies of their methodology. Furthermore, to claim that their opinions should be barred because "evidence spoliation" precluded all other possible causes of the fire from being eliminated is simply preposterous. *Daubert* Motion, p.15.  Midland has filed a separate Motion for Sanctions Based Upon Spoliation, which Pekin has responded to in writing, so it will suffice to note that any alleged spoliation was occasioned by a third-party over whom Pekin had no control, that Mager adequately secured the scene after his first investigation, and Midland has failed to note either what additional safe-keeping measures Mager should have taken or (other than vague cries of foul play) even how they have been prejudiced by the alleged spoliation.

Midland claims that "numerous artifacts and conditions that remained at the scene were either not collected for examination or were ignored," and it lists things such as the TV, VCR player, ceiling fan and portions of the branch wiring.  *Daubert* Motion, p.16.  In their respective affidavits, Mager and Diggle discuss all of these items and then some, and go on to detail how and why they ruled them out as possible sources of the subject fire.  *See* Exs. A & C.  And although Midland would have this Court fault Mager and Diggle for not inspecting the tripped circuit breakers after the fire, Midland's own expert, Benjamin Mills, testified that "with a fire in any structure like that, you'll have fire impinging on conductors which can result in triggering of circuit breakers."  *See* Benjamin Mills' deposition transcript (previously submitted to this Court by Midland), p.75.  Clearly, any argument about the tripped circuit breakers is nothing more than a red herring designed to distract this Court's attention.

Midland makes it seems as if a Class 2 power supply is the end-all, be-all in fire protection for appliances, but that is far from the case.  As Diggle notes,  "a scientific analysis of

the specified power limitations of a Class 2 circuit compared with the heat release rate of other relatively low-power ignition sources proves that Class 2 circuits cannot be eliminated as potential ignition sources based upon their classification alone." *See* Ex. C, p.10.  While the maximum rated available power source for a Class 2 circuit is limited to 100 watts, which may seem like a limited amount of available power, according to Diggle "it is more than enough power to lead to fire ignition under the right failure conditions and available fuel package." *Id.*, p.11.  The National Electric Code defines a Class 2 Circuit as the "portion of the wiring system between the load side of a Class 2 power source and the connected equipment" and states that "due to its power limitations, a Class 2 circuit *considers safety from a fire initiation standpoint* and provides acceptable protection from electric shock."  Yet this definition, relied on so heavily by Midland, does not state that Class 2 circuits cannot create a fire hazard and is certainly not a guarantee that fire initiation is impossible where a Class 2 circuit is involved. *See* Ex. C, pp.11-12.  And the fact that no other fires have ever allegedly been caused by a Midland weather alert radio is yet another red herring and certainly does not mean that one did not take place in this instance.  As any soccer goalie knows, all it takes is one.

Midland next takes Mager and Diggle to task for not performing any tests on the radio, which is ironic because the fire consumed all of the radio's housing and a majority of the circuit board, so there was nothing to test.  Midland overlooks that Diggle did purchase an exemplar radio and performed ignition tests on the housing, which resulted in a "flaming drip that fell and pooled on the floor." *Id.*, pp.13-14.  Defendant's expert Benjamin Mills performed a similar experiment using a butane lighter and observed the same results. *See* Benjamin Mills' deposition transcript (previously submitted to this Court by Midland), pp.89-90.  Diggle's experiment confirmed that the radio's plastic housing contained no special fire retardant properties and was a

competent fuel source that was in close proximity (less than one-quarter inch) from the electrical

components on the radio's circuit board.  *See* Ex. C, p.14.  Most glaringly, Midland completely

ignores the fact that its own expert, Benjamin Mills, testified that since the weather alert radio

was the only known potential electrical ignition source in the area, it could not be ruled out as the

source of the subject fire.  *See* Benjamin Mills' deposition transcript (previously submitted to

this Court by Midland), pp.92-93.

Pekin has painstakingly detailed the methodology employed by its experts in formulating

their opinions.  As the courts have stated:

> We do not mean to suggest, of course, that hands-on testing is an absolute
> prerequisite to the admission of expert testimony. Rule 702 is designed to ensure
> that, when expert witnesses testify in court, they adhere to the same standards of
> intellectual rigor that are demanded in their professional work. This objective can
> be accomplished in a number of different ways, including through the review of
> experimental, statistical, or other scientific data generated by others in the field.
> Indeed … we acknowledged that "*there may be a situation in which personal
> experiments or observations meet the requirements of Daubert.*"

*Cummins*, 93 F.3d at 369 (citation omitted).  As detailed above, the NFPA allows for the

conclusion that something caused a fire even if the physical evidence of that thing no longer

exists, through the use of other evidence to deduce the origin and cause of a fire.  It is only where

there is *no evidence* of any sort from which deductions can be made that the process of scientific

deduction, mislabeled by Midland as "negative corpus," is inappropriate.  As shown here there

was more than sufficient evidence for Mager and Diggle to consider and rely on in forming their

opinions, and they should be allowed to provide those opinions before a trier of fact.  As  "the

rejection of expert testimony is the exception rather than the rule," Midland's *Daubert* Motion to

Exclude the Opinion Testimony of Plaintiff's Experts should be denied.  *Hoover*, 2003 WL

22038639 at *1 (citation omitted).

Finally, pursuant to Local Rule 7.1(A)(2), Pekin request oral argument on Midland's Motion and a *Daubert* hearing so that Pekin's experts can further explain their findings and methodology and answer any further questions this Honorable Court may have.  Given the technical nature of the testimony, Pekin feels this Motion would be best addressed via oral argument.

WHEREFORE, Plaintiff PEKIN INSURANCE CO. as subrogee of DONALD and LYDIA LEVEQUE, by and through its undersigned counsel, respectfully requests the entry of an Order denying the *Daubert* Motion to Exclude the Opinion Testimony of Plaintiff's Experts filed by Defendant MIDLAND RADIO CORPORATION with prejudice, or at a minimum entertain oral argument and conduct a *Daubert* hearing, and award any and all other equitable relief deemed just and appropriate.

Respectfully submitted,

PEKIN INSURANCE CO. as subrogee of DONALD and LYDIA LEVEQUE,

By:    _____ /s/ Russell M. Barnett _____
       One of Plaintiff's attorneys

Russell M. Barnett - 6224426
Esp Kreuzer Cores, LLP
400 S. County Farm Rd., Ste. 200
Wheaton, Illinois  60187
Phone:  630.344.6553
Fax:  630.871.0224

CERTIFICATE OF SERVICE

I, Russell M. Barnett, an attorney, certify that on July 17, 2014, the foregoing Plaintiffs' Memorandum of Law in Response to the Defendant's *Daubert* Motion to Exclude the Opinion Testimony of Plaintiff's Experts was filed electronically with the Clerk of the Court using the ECF system.  A copy of the instant document will be sent automatically to all attorneys of record.

/s/ Russell M. Barnett
Russell M. Barnett