UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

PEKIN INSURANCE CO., as subrogee )
of DONALD and LYDIA LEVEQUE )
)
Plaintiff, )
)
v. ) No. 13-cv-2048
)
MIDLAND RADIO CORPORATION, )
)
Defendant. )

<u>AFFIDAVIT OF DAVID A. MAGER, CFI</u>

STATE OF ILLINOIS )
 )
COUNTY OF DUPAGE )

BEFORE ME, the undersigned authority, personally appeared David A. Mager, CFI, who appeared before me and upon his oath stated as follows:

1. My name is David A. Mager, CFI. I am over the age of eighteen (18), of sound mind, and competent to make this affidavit. I am a Fire Investigator for Rimkus Consulting Group, Inc. I was one of the employees assigned by Rimkus to provide services for the residential fire investigation of the Donald and Lydia Leveque residence. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. A copy of my current CV is attached as Exhibit A, which identifies my experience and qualifications to render opinions in this matter. I am a Certified Fire Investigator with the Illinois State Fire Marshall Office and International Association of Arson Investigators. I am also a Certified Fire Officer II with the Illinois State Fire Marshall

1

Office. I have investigated over 150 fires and my professional experience includes fire and explosion investigations, fire protection and detection systems and hazardous materials mitigations.

3. I have been employed by Rimkus since 2008 and regularly provide expert witness and consulting services in these areas. I am also a Certified Fire Instructor II and conduct live fire training exercises for firefighters through the Illinois State Fire Marshall Office, which includes the use of authentic room furnishings and classes on fire behavior and evidenced preservation. I am also a Deputy Chief and Training Officer with the Midlothian, Illinois Fire Department.

4. I have reviewed the Brief in Support of Daubert Motion to Exclude the Opinion Testimony of Plaintiff's Experts David Mager and John Diggle, filed on behalf of Defendant Midland Radio Corporation. The purpose of this Affidavit is to address the arguments raised by Defendant in the Brief.

5. As background for the assignment, Rimkus received the assignment on November 28, 2011. I performed an initial on-site fire investigation on November 30, 2011 and a second inspection on December 19, 2011.

6. For the November 30 inspection, I took 155 photographs. I also interviewed Mr. Leveque and spoke with a member of the St. Anne Fire Department. . I used yellow

2

"Evidence Do Not Disturb" caution tape to cordon off the dining room. I billed 5.0 hours on this date.

7. For the December 19 inspection, I took 143 photographs. I billed 7.8 hours on this date.

8. I was also present for the January 30, 2012 laboratory evidence examination with Rimkus employee John H. Diggle III, P.E., CFEI to examine all artifacts collected from the scene. This exam included the taking of 129 photographs. Benjamin Mills and Michael Rupp of SEA Limited were also present at this examination. I billed 4.0 hours for the examination time.

9. To date, I have billed 27.3 hours on this file, which consists of time spent for the on-site fire examinations, laboratory examination of artifacts from the fire scene, preparation of a written report, providing a deposition, meetings and telephone calls with attorneys, review of file materials and photographs and a review of my deposition transcript.

10. Burn patterns, potential ignition sources, witness statements and fire dynamics were used in determining the area of origin for this fire. NFPA 921, Chapter 17 Origin Determination, 17.1.2 states: "Determination of the origin of the fire involves the coordination of information derived from <u>one or more</u> of the following: Witness Information, Fire Patterns, Arc Mapping and Fire Dynamics.

11. An interview with a member of the St. Anne Fire Department confirmed the fire was in the dining room and at the north wall at the window. The fire department stated they had flames in the dining room and they also saw them at that window when they arrived on the scene.

12. The burn patterns were analyzed and were consistent with the fire originating at the north wall of the dining room. NFPA 921, Chapter 6 Fire Patterns, 6.3.3.1 Walls and Ceilings; states: "Fire patterns are often found on walls and ceilings. As the hot gas zone and the flame zone of the fire plume encounter these obstructions, patterns are produced that investigators may use to trace a fire's origin." The movement of the fire and heat from the center of the north wall of the dining room up and outward into the kitchen and other areas of the structure were consistent with the general principals of fire behavior (*Kirk's Fire Investigation 5th Edition, Chapter 7, p. 171, General Principles of Fire Behavior*)("*Hot gases (including flames) are much lighter than the surrounding air and, therefore, rise. In the absence of strong winds or physical barriers (such as noncombustible walls), which force flames to travel elsewhere, fire will always preferentially burn upward (with some downward travel as a result of radiation).*"

13. Other areas of origin were considered and eliminated for lack of fire damage or lack of potential ignition sources. The entire house was examined. As I examined the house, I observed no direct fire damage to other rooms therefore eliminating any

4

other rooms as rooms of origin. Eliminating the other rooms in turn eliminated any potential ignition sources within those rooms.

14. The television was eliminated as an ignition source for this fire due to the lack of fire damage and its location in a room other than the room with direct fire damage, the kitchen. Had a fire originated in the television it would have been severely damaged to the point of being consumed. The burn patterns were not consistent with the fire originating at the television and communicating to the dining room. Photographs of the television taken at the fire scene on November 30, 2011 show that this appliance sustained minimal direct fire damage and was not located within the area of origin.

15. The ceiling fan/lamp was eliminated as a potential ignition source due to the lack of fire damage to the fixture; it's location with respect to the damage in the room and the lack of a first fuel present in close proximity to the fan/lamp to ignite. There were no other burn patterns above or below the fan/lamp to support a fire had originated there. Photographs of the ceiling fan taken at the fire scene show that it too had sustained minimal direct fire damage, near a fuel package to propagate the fire and was not located within the area of origin.

16. The computer equipment and power strip were considered as potential ignition sources. They were eliminated because they were not plugged in at the time of the fire. Photographs taken at the initial inspection on November 30, 2011 show that the

plug for the power strip was not plugged in at the time of the fire. This was confirmed in the deposition testimony of Mr. Leveque (p. 24).

17. Photographs of the branch circuit wiring within the dining room wall show that it had sustained minimal direct fire damage. The insulation on the branch circuit cable was partially charred but was not consumed by the fire. I examined the burn patterns within the wall cavity of the dining room. If the fire originated at the branch wiring within the wall, the fire damage would have been severe inside the wall cavity before the fire breached the wall covering and extended into the room. There was very little if any damage inside the wall cavity thus that wiring was considered as an ignition source and rejected. I concluded that the fire did not originate within the wall cavity where the branch circuit wiring was routed.

18. NFPA 921. Section 17.6.1.1 also states: *"Unless there is reliable evidence to narrow the origin to a particular portion of the room, every potential ignition source in the compartment of origin should be given consideration as a possible cause."* Although there was heat damage throughout various other rooms of the house, the fire damage was contained to the northern half of the dining room. This is evident by the photos taken at the scene exam on November 30, 2011.

19. All competent ignition sources within the northern half of the dining room were considered in the investigation.

6

20. Defendant's Brief cites to NFPA 921, Section 18.6.5. This section discusses inappropriate use of the process of elimination and negative corpus. Negative corpus does not apply here because there is a competent ignition source which was recovered in the area of origin.

21. This section of NFPA 921 (2011) was written primarily due to investigators classifying fires as incendiary or accidental when all known potential ignition sources were eliminated. However, in this investigation we have a competent ignition source which was recovered in the area of origin. The use of elimination of potential known ignition sources is part of the investigation process and hypothesis testing.

22. NFPA 921 instructs the investigator to consider all potential ignition sources for a given fire and to eliminate any hypothesis that is not supportable by the facts of the investigation.

23. Other than the electrical artifacts recovered from the area of origin, all other reasonable potential ignition sources were eliminated during the initial inspection. An incendiary fire was considered and eliminated due to means of access; the owners were in Florida and the structure was secure when the fire department arrived as they had to force entry through the front door. Also, personal and high valued items were still in the house, including guns, bow and arrows, big screen TVs and other electrical components.

7

24. A check of the weather and a Strikenet report confirmed there were no storms or lightning in the area at the time of the fire. This eliminated any natural causes.

25. The homeowners had been absent the house for seven (7) days. As a result, candles and careless use of smoking materials could be eliminated.

26. All artifacts that could not be eliminated through cognitive testing (i.e. unplugged or outside the area of origin) were collected. Defendant was aware of the loss and the potential subrogation before our investigation, but chose not to have an expert attend the artifact recovery and declined to request any other artifacts be maintained.

27. The fire investigation I performed was in accordance to NFPA 921 Guide for Fire & Explosion Investigations. All realistic potential ignition sources were considered and each potential hypothesis was tested via fundamental principles of science, scientific literature, physical experiments, or cognitive experiments. The only potential ignition source that could not be ruled out was the Midland WR-100 weather alert radio.

28. It is obvious that a fire did occur. The radio was plugged in, electrically energized, and located within the area of origin at the time of the fire. The fire damage to the radio was too extensive for the exact causal failure to be determined. However, the sum of the evidence collected from the fire scene shows that the fire was most probably the result of an electrical failure on the circuit board of the Midland WR-100 weather alert radio.

8

FURTHER AFFIANT SAYETH NOT

_____
David A. Mager, CFI

SUBSCRIBED AND SWORN to before me on this 16 day of July, 2014.

_____
Notary Public in and for the State of Illinois

-SEAL-

OFFICIAL SEAL
SHARON L RYBAK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/22/15

9