**E-FILED**
Thursday, 17 July, 2014  06:31:28 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| PEKIN INSURANCE CO., as subrogee | ) | |
| of DONALD and LYDIA LEVEQUE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-2048 |
| | ) | |
| MIDLAND RADIO CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF JOHN H. DIGGLE III, P.E., CFEI**

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) |
| COUNTY OF DUPAGE | ) |

BEFORE ME, the undersigned authority, personally appeared John H. Diggle III, P.E., CFEI, who appeared before me and upon his oath stated as follows:

1. My name is John H. Diggle III, P.E., CFEI. I am over the age of eighteen (18), of sound mind, and competent to make this affidavit. I am a Principal Consultant for Rimkus Consulting Group, Inc. I was one of the employees assigned by Rimkus to provide services for the residential fire investigation of the Donald and Lydia Leveque residence. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. A copy of my current CV is attached as Exhibit A, which identifies my experience and qualifications to render opinions in this matter. I received a Bachelor of Science degree in Electrical Engineering from Cedarville University in 2000. I am a Certified Fire and Explosion Investigator (Reg. No. 16069-8616) and am a registered

professional engineer in the states of Illinois, Indiana, Wisconsin, Iowa, Missouri, Minnesota, Kentucky, Ohio, Michigan, Tennessee, Mississippi and Louisiana.  I am also a Member of the National Fire Protection Association (NFPA).

3. I have been employed with Rimkus since 2010 and regularly provide expert witness and consulting services regarding electrical failures, including forensic investigations of electrical systems and appliances to determine potential failure scenarios, residential, commercial and industrial building fire investigations, and consumer product failure analysis.

4. I have reviewed the Brief in Support of *Daubert* Motion to Exclude the Opinion Testimony of Plaintiff's Experts David Mager and John Diggle, filed on behalf of Defendant Midland Radio Corporation.  The purpose of this Affidavit is to address the arguments raised by Defendant in the Brief.

5. As background for the assignment, Rimkus received the assignment on November 28, 2011.  David A. Mager, CFI, a Rimkus employee and fire investigator also assigned to this project, performed on-site fire investigations on November 30, 2011 and December 19, 2011.

6. On January 30, 2012, I performed a laboratory evidence examination to examine all artifacts collected from the scene, which included taking 129 photographs.  Mr.

Mager was present at this examination along with Benjamin Mills and Michael Rupp of SEA Limited.  I billed 4.0 hours for the examination time.

7. A subsequent laboratory artifact examination took place on February 9, 2012.  On this date an exemplar weather alert radio was inspected and tested.  I took 18 photographs for this examination.

8. To date, I have billed 22.0 hours on this file, which consists of time spent for laboratory examinations of artifacts from the fire scene and an exemplar radio, preparation of a written report, providing a deposition, meetings and telephone calls with attorneys, review of file materials and photographs and a review of my deposition transcript.

9. Mr. Mager performed a fire scene examination and located the remains of a circuit board on the floor amidst the burned remains of an antique wood desk in the dining room. This area was later identified to be the area of fire origin. The circuit board was subsequently identified to be the remains of a Midland WR-100 weather alert radio. The damage sustained by the radio circuit board was consistent with the radio being located on the antique wood desk at the time of the fire.

10. The power supply adapter for the radio was found plugged into a receptacle outlet on the north wall of the dining room at the fire scene. A visual inspection and burn pattern analysis of the receptacle outlets in the dining room revealed that the radio

was the only electrical device that was plugged in within the room of origin at the time of the fire.

11. Both Donald and Lydia Leveque stated in their deposition testimony that the radio was located on the desk at the time of the fire and that it was the only electrical device that was plugged in within the dining room at the time of the fire (*Lydia Leveque deposition transcript pp. 20, 37, 54*) (*Donald Leveque deposition transcript pp. 13, 17, 24, 40*).

12. Laboratory examination of the weather alert radio circuit board revealed that the radio had sustained significant fire damage. The entire plastic housing for the radio was consumed by the fire. The electrical components that populated the circuit board had become desoldered and were no longer attached to the circuit board. The circuit board itself exhibited uniform and severe fire damage along the entire board.

13. Among the artifacts examined in the laboratory, no other electrical device exhibited as much fire damage as the radio. Other than the radio, no other potential ignition sources were found among the artifacts examined in the laboratory.

14. The damage to the circuit board was too extensive for it to be possible to identify the specific electrical failure that may have occurred on the circuit board. However, the affirmative physical evidence indicated that the radio was positioned within the center of the area of origin at the time of the fire. Also, the affirmative physical evidence

indicated that the radio sustained severe and localized fire damage to its main body. In addition, the affirmative physical evidence indicated that the radio was plugged in and energized at the time of the fire. Furthermore, no other electrical device within the dining room was plugged in at the time of the fire.

15. The elimination of all other causes was a part of my final conclusions, but was not the entire basis. The careful consideration of all realistic potential ignition sources and systematic elimination, if possible, of the potential ignition sources is a component of the scientific method as detailed in NFPA 921. The 2014 edition of NFPA 921 Guide for Fire & Explosion Investigations, section 19.5 states:

"**19.5 Developing a Cause Hypothesis.** The investigator should use the scientific method *(see the Basic Methodology chapter)* as the method for data gathering, hypothesis development, and hypothesis testing regarding the consideration of potential ignition sequences. This process of consideration actually involves the development and testing of alternate hypotheses. In this case, a separate hypothesis is developed considering each individual competent ignition source at the origin as a potential ignition source. *Systematic evaluation (hypothesis testing) is then conducted with the elimination of those hypotheses that are not supportable (or refuted) by the facts discovered through further examination. The investigator is cautioned not to eliminate a potential ignition source merely because there is no obvious evidence for it. For example, the investigator*

***should not eliminate the electric heater because there is no arcing in the wires or because the contacts are not stuck.*** There may be other methods by which the heater could have been the ignition source other than a system failure, such as combustible materials being stored too close to it. Potential ignition sources should be eliminated from consideration only if there is reliable evidence that they could not be the ignition source for the fire. ***For example, an electric heater can easily be eliminated from consideration if it was not energized."*** (emphasis added).

16. NFPA 921 instructs the investigator to consider all realistic potential ignition sources for a given fire and to eliminate any hypothesis that is not supportable by the facts of the investigation. The 2011 NFPA section 18.6.5 referenced in the brief states:

"The process of determine the ignition source for a fire, by eliminating ***all*** ignition sources found, known, or believed to have been present in the area of origin, and then claiming such methodology is proof of an ignition source of ***which there is no evidence of its existence***, is referred to by some investigators as "negative corpus." (emphasis added).

17. The scientific method employed by me for this investigation differs from "negative corpus" in two key facets: In this case, not all known potential ignition sources have been eliminated (i.e. the Midland weather alert radio) and the existence of the radio within the area of origin is clearly indicated by the physical evidence.

6

18. During the course of this fire investigation, I considered all reasonable potential ignition sources for the cause of this fire, including the following potential electrical ignition sources found within the room of origin: the weather radio, a digital picture frame, a printer, a power strip, a television set, a VCR, a ceiling fan, the receptacle outlets, and the branch circuit wiring.

19. The printer and power strip were both eliminated because the physical evidence and homeowner testimony are consistent that these items were neither plugged in nor energized at the time of the fire. The computer and monitor associated with the printer were reported by Donald Leveque to have been removed from the dining room approximately one (1) month prior to the fire (*Donald Leveque deposition transcript p. 23*). The photographs of the printer and power strip show that these items sustained minimal direct fire damage and were not located at the origin of this fire. No remains of the computer and monitor were found in the room of origin.

20. The television set and VCR were located outside the room of origin at the time of the fire (*Deposition transcript of Donald Leveque p. 26*). The television and VCR were not located within the area of origin during the initial site inspection. Photographs of these items taken at the fire scene show that these appliances sustained minimal direct fire damage and were not located within the area of origin.

21. Photographs of the ceiling fan taken at the fire scene indicated that it too had sustained minimal direct fire damage and was not located within the area of origin.

22. Photographs of the branch circuit wiring within the dining room wall show that it had sustained minimal direct fire damage. The insulation on the branch circuit cable was partially charred but was not consumed by the fire.

23. Mr. Mager examined the burn patterns within the wall cavity of the dining room and concluded that the fire did not originate within the wall cavity of the dining room. The combustible material located within the wall cavity of the dining room did not exhibit a severe amount of direct fire damage.

24. The receptacle outlets from the north wall of the dining room were recovered from the fire scene and were inspected in the Rimkus laboratory. The plastic bodies for both receptacles were still intact and exhibited minimal direct fire damage. No evidence of any electrical arcing activity or other electrical failure was found on either receptacle. The damage exhibited by either receptacle was not consistent with the device being located at the point of origin of this fire. An analysis of the fire patterns to the faces of the two receptacles indicated that the weather alert radio was the only device plugged in within the dining room at the time of the fire.

25. Lydia Leveque reported that the digital picture frame was not plugged in at the time of the fire and was not located on the antique wood desk (*Lydia Leveque deposition*

*transcript pp. 37, 39*). Mr. Mager's investigation also found that the frame could not have been plugged into an outlet at the time of the fire. No remains of any power cord for the digital picture frame were recovered from the fire scene. The power cord does not have the potential to start a fire if it is not plugged into an outlet. The plastic body of the digital picture frame was mostly intact and was not significantly damaged by direct fire attack. The damage exhibited by the digital picture frame was not consistent with the device being located at the point of origin of this fire.

26. The weather alert radio was the only known potential electrical ignition source that could not be ruled out. Defendant's expert, Benjamin Mills, also testified that the radio could not be completely ruled out. (*Mills depo. pp 92, 93*).

27. The conclusion that the fire was most probably the result of an electrical failure on the main circuit board of the Midland WR-100 weather alert radio is based upon the systematic elimination of all other reasonable potential ignition sources, the affirmative physical evidence of the radio's location and fire damage, and cognitive testing of the ignition potential of an electrical appliance powered by a class 2 power supply.

28. We considered all reasonable potential ignition sources for this fire and were able to eliminate all potential ignition sources other than the energized electrical items located within the area of origin. The Midland WR-100 weather alert radio was the only energized electrical device that was found within the area of origin. The weather

alert radio was the only energized electrical device that was reported by the homeowners to have been located within the area of origin at the time of the fire. The weather alert radio was the only reasonable potential ignition source that could not be eliminated as the cause of this fire.

29. All of the electrical items known to have been located within the dining room were either inspected by me in the Rimkus laboratory or were visually inspected by me via fire scene photographs. The TV, VCR, ceiling fan, and electrical cable referenced in Defendant's brief can be eliminated as potential ignition sources based on the physical facts that they were not significantly fire damaged and were located well outside of the area of fire origin.  Neither Benjamin Mills nor David Kingsolver, expert witnesses retained by the Defendant, were able to identify any reasonable alternate potential ignition source for this fire during their deposition testimony.

30. A scientific analysis of the specified power limitations of a class 2 circuit compared with the heat release rate of other relatively low-power ignition sources proves that class 2 circuits cannot be eliminated as potential ignition sources based upon their classification alone.

31. The NEC defines Class 2 circuits as circuits with inherently limited power sources. The maximum rated available power source for a class 2 circuit is limited to 100VA (or 100 watts) for power supplies with maximum voltages below 30 volts DC (2014 NEC, Chapter 9, Table 11B). The maximum available power in an electrical system is

also the maximum available rate at which it can generate heat energy under fault conditions.

32. While 100 watts may sound like a limited amount of available power, it is more than enough power to lead to fire ignition under the right failure conditions and available fuel package. Consider a 100-watt light bulb for instance. The heat energy generated by a 100-watt light bulb can certainly reach temperatures high enough to ignite combustible materials in contact with the outside of the glass bulb. The heat release rate for a burning wood kitchen match has been experimentally determined to be approximately 50 watts and a smoldering lit cigarette has a heat release rate of approximately 5 watts (DeHaan, Kirk's Fire Investigation 6th edition, Table 3.3). Both of these items are capable ignition sources under the right conditions for the right combustible materials and generate heat below the 100 watt maximum for a class 2 electrical power supply.

33. One might read off the voltage and current ratings for the subject weather radio's power supply adapter (12 volts DC and 0.2 amps, respectively) and claim that the maximum potential power output of this power supply (2.4 watts, or 12 volts x 0.2 amps) is significantly less than the maximum allowable 100 watts for a class 2 power supply. However, a power supply can potentially generate power beyond its nameplate rating for short periods of time under fault conditions.

34. The Defendant references the Class 2 definition from The National Electric Code (NEC) article 725.2 in the brief (*Brief in Support of Daubert Motion, p. 9*), which states in the 2014 edition:

> "Class 2 Circuit. The portion of the wiring system between the load side of a Class 2 power source and the connected equipment. Due to its power limitations, a Class 2 circuit ***considers safety from a fire initiation standpoint*** and provides acceptable protection from electric shock." (emphasis added).

35. This definition does not state that class 2 circuits cannot create a fire hazard, the NEC definition merely contains the phrase "considers safety from a fire initiation standpoint." This definition is not a guarantee that fire initiation is impossible for a class 2 circuit. Such a guarantee would fall outside the scope of the National Electric Code.

36. A physical experiment was performed to qualitatively test the flammability of the plastic housing for the Midland radio. Also, the use of scientific literature, fundamental principles of science, and cognitive experiments were used in hypothesis testing when considering the various potential causes of the fire. Neither the scientific method nor NFPA 921 requires that testing be a physical experiment. The 2014 edition of NFPA 921, section 18.6.4 details the possible means of hypothesis testing, which includes:

"Hypothesis testing may include: any application of fundamental principles of science, physical experiments or testing, cognitive experiments, analytical techniques and tools, and systems analysis."

37. As detailed above, all other electrical ignition sources beside the radio that were found within the area of origin were evaluated and eliminated using cognitive experiments and fundamental principles of science. For example, a fundamental principle of science is that a printer that has not been plugged in for several weeks will not contain any electrical energy and therefore cannot be a potential ignition source. As another example, a cognitive experiment was performed on the digital picture frame: if the picture frame was located at the point of origin of this fire, then it would exhibit significant fire damage. Because it exhibits only very minor damage consistent with external thermal attack and most of the plastic enclosure is still intact, it was not at the point of origin and therefore was not the cause of the fire.

38. When considering whether the Midland radio was a potential cause of this fire, a physical experiment was performed in order to evaluate whether the plastic enclosure that was in close proximity (less than one quarter inch) to the radio's circuit board was capable of ignition and sustained combustion. A piece of plastic was removed from an exemplar Midland WR100 radio and was held up to a propane torch. It was observed that the plastic ignited quickly and sustained combustion long after the propane torch was removed. The sustained burning of the plastic led to a flaming drip that fell and pooled on the floor.

39. Defendant's expert Benjamin Mills performed a similar experiment using a butane lighter and observed the same results (*Benjamin Mills deposition transcript, pp. 89-90*). This experiment confirmed that the radio's plastic housing contained no special fire retardant properties and was a competent fuel source that was in close proximity (less than one-quarter inch) from the electrical components on the radio's circuit board.

40. The remains of the circuit board also passed the cognitive experiment posed above for the digital picture frame. If the weather radio was located at the point of origin of this fire, then it would exhibit significant and severe fire damage. Because the radio exhibited severe fire damage, including the complete consumption of the plastic housing and significant fire damage to its circuit board, it may have been located at the point of origin for this fire.

41. Fundamental principles of science and scientific literature were also considered when testing whether the class 2 power supply for the radio could deliver sufficient electrical power under electrical fault conditions to generate sufficient heat to ignite combustible materials.

42. The fire consumed much of the combustible material within the area of origin and therefore the precise chain events for the fire spread from fuel source to fuel source cannot be determined. However, the plastic housing of the radio, which was tested and demonstrated to be a competent fuel source, was located in close proximity to the

14

weather alert radio circuit board.  In addition, multiple competent secondary fuel sources, including picture frames, mini blinds, and the wood desk were reported to have been located within the area of origin by the homeowners.

43. As described above, a burn analysis experiment of the plastic housing for the weather alert radio demonstrated that it was a competent first fuel supply. Visual examination and measurements of an exemplar Midland weather alert radio showed that the plastic housing for the weather alert radio was positioned less than one quarter inch directly above the circuit board inside the radio.

44. Donald Leveque testified that there were mini blinds on the north window of the dining room (*Donald Leveque deposition transcript p. 15*) and that there were picture frames on the antique wood desk (*Donald Leveque p. 17*). Lydia Leveque testified that there were half a dozen picture frames located on the antique wood desk, and that photo albums lined the lower shelf of the wood desk below the desktop (*Lydia Leveque deposition transcript pp. 20, 27-28*). There were sufficient secondary fuel sources within the area of origin that would have been ignited by the fully involved burning and pooling of the weather alert radio's plastic housing.

45. The fire investigation performed by myself and Mr. Mager of Rimkus was in accordance to NFPA 921 Guide for Fire & Explosion Investigations. All realistic potential ignition sources were considered and each potential hypothesis was tested

via fundamental principles of science, scientific literature, physical experiments, or cognitive experiments.

46. The only potential ignition source that could not be ruled out was the Midland WR-100 weather alert radio. The radio was plugged in, electrically energized, and located within the area of origin at the time of the fire. The fire damage to the radio was too extensive for the exact causal failure to be determined. However, the sum of the evidence collected from the fire scene indicated that the fire was most probably the result of an electrical failure on the circuit board of the Midland WR-100 weather alert radio.

FURTHER AFFIANT SAYETH NOT.


*John Diggle*
_____
John H. Diggle III, P.E., CFEI


SUBSCRIBED AND SWORN to before me on this 16th day of July, 2014.


_____
Notary Public in and for the State of Illinois


-SEAL-


OFFICIAL SEAL
BRANDI D ZAMOST
Notary Public - State of Illinois
My Commission Expires Oct 29, 2017